UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RYAN RANER,

                Plaintiff,

      v.

THE FUN PIMPS ENTERTAINMENT LLC;

JOEL HUENINK; RICHARD HUENINK

                Defendant.

Case No. 3:22-cv-05718-TMC

ORDER DENYING MOTION TO DISMISS
INDIVIDUAL DEFENDANTS AND
MOTION FOR LEAVE TO FILE
SUPPLEMENTAL DECLARATION AND
CORRECTED BRIEF

**ORDER**

Before the Court is Defendants Joel and Richard Hueninks' (collectively, "the

Hueninks," individually, "Joel" and "Richard") motion to dismiss individual defendants, Dkt. 76,

and Plaintiff Ryan Raner's ("Raner") motion for leave to file a supplemental declaration and

corrected brief in opposition to the Hueninks' motion to dismiss, Dkt. 98. The Hueninks ask the

Court to dismiss them from this lawsuit for lack of personal jurisdiction. Raner's motion seeks to

supplement his opposition brief and supporting evidentiary materials with additional information

about his residency during certain periods of time relevant to the personal jurisdiction analysis.

For the following reasons, the Court DENIES the motion to dismiss and DENIES the motion for

leave.

## I.    BACKGROUND

Raner is a video game developer who worked with the Hueninks and their company, The Fun Pimps Entertainment, LLC ("The Fun Pimps"), to develop a video game called "7 Days to Die" between 2013 and 2022. Dkt. 53 ¶¶ 1, 78. This case concerns a dispute over Raner's compensation during his time at The Fun Pimps. Raner alleges that, when he first agreed to work on the game, the parties agreed he would be paid a five percent royalty from its sales. *Id.* ¶¶ 22–27. After Raner received his first payment, The Fun Pimps told him it "was based on net profits for pre-orders of the game" less deductions for "start-up costs." *Id.* ¶¶ 33–34. From that point on, The Fun Pimps made regular royalty payments to Raner. *Id.* ¶ 32. He received "periodic assurances" from The Fun Pimps that he was being paid what he was due under the royalty agreement and did not suspect otherwise until 2021. *Id.* ¶¶ 35–36.

In December 2021, Raner received a quarterly payment that was lower than he expected. *See id.* ¶¶ 36–37. In July 2022, Raner asked The Fun Pimps' payroll department to provide him with an accounting for his past royalty payments and "gross sales numbers." *Id.* ¶ 39. In response, Richard set up a phone call with Raner on September 9, 2022. *Id.* ¶ 40. During the call, Richard declined to give Raner the gross sales numbers he had requested, but informed him that "as late as 2021, [The Fun Pimps] had started making additional new deductions above and beyond the limited start-up expenses discussed in 2013." *Id.* During the phone call, Richard also "demanded" that Raner sign an independent contractor agreement that did not contain the five percent royalty, "waived Raner's right to assert claims against [The Fun Pimps] relating to his prior work for [The Fun Pimps], lowered his overall compensation, and assigned the intellectual property rights for Raner's work to [The Fun Pimps]." *Id.* ¶ 41. On September 15, 2022, Raner made another request for a royalty calculation and accounting relating to past payments. *See id.* ¶ 42. In response, Richard arranged another phone call with Raner in which he "continued to

ORDER DENYING MOTION TO DISMISS INDIVIDUAL DEFENDANTS AND MOTION FOR LEAVE TO FILE SUPPLEMENTAL DECLARATION AND CORRECTED BRIEF - 2

pressure Raner into signing the draft contractor agreement." *Id.* Raner declined to do so, and instead filed this lawsuit on September 28, 2022. *Id.* ¶ 43. Upon learning of the suit, The Fun Pimps terminated its relationship with Raner. *Id.* ¶ 44.

Joel and Richard are each principals and officers of The Fun Pimps, *id.* ¶ 1, and Richard is its owner and Chief Executive Officer ("CEO"), Dkt. 77 ¶ 5. Each interacted with Raner to varying degrees before and during Raner's time working on the game. Raner first met the Hueninks in 2003, soon after he graduated high school, through game forums run by the Hueninks for their former game development company, 4D Rulers Software, Inc. Dkt. 53 ¶¶ 16–17. From 2005 through 2008, "Raner and the Hueninks worked together on several video game projects." *Id.* ¶ 19. After those projects ended, Raner and Joel "stayed in touch." *Id.*

In December 2012, soon after Raner had moved to Vancouver, Washington, Joel reached out to Raner over Facebook Messenger and email to recruit him to work on "7 Days to Die."[1] Dkt. 83 ¶¶ 9–10. During their conversation, Raner mentioned that he had moved back to his "hometown" and was considering finding work in "Redmond" so he could "at least be a few hours drive from home." Dkt. 83 ¶ 9; Dkt. 83-10 at 2. Raner states in his declaration that his message was referencing Redmond, Washington. Dkt. 83 ¶ 9. According to Raner, he had previously told Joel that he was from Vancouver, Washington in their conversations "over the years."[2] Dkt. 83 ¶ 9. After Raner told Joel about his move to Washington, Joel informed him about the game and asked if he would be interested in working on it. Dkt. 83-10 at 2.

---

[1] At the time, the game was still in its early stages of development and was being referred to as "Thirty Days to Die." Dkt. 53 ¶ 20.

[2] Raner submitted into evidence a November 2006 email to Joel, in which he mentions that he was "back in Washington with family." Dkt. 83-11 at 2. He states this is an "example" of a time that he informed Joel that he was from Washington prior to Joel's solicitation of him in 2012. Dkt. 83 ¶ 9 (citing Dkt. 83-11). Joel states in his declaration that he "never kept track of where

1     Soon after Joel solicited Raner to work on the game, Raner responded that he was

2  "definitely interested in being involved." Dkt. 83-10 at 3. Around a month later, on January 15,

3  2013, Joel messaged Raner again to update him on the ongoing development of the game's

4  design and technological features. *Id.* at 5. He told Raner, "[t]hings are progressing nicely." *Id.*

5  From January 16 until January 20, 2023, Joel and Raner communicated over email about the

6  initial plans for their working relationship. *See generally* Dkt. 83-12. The parties finalized their

7  work agreement during this exchange and agreed that Raner would be paid the five percent

8  royalty. Dkt. 53 ¶¶ 21–26; *see* Dkt. 78 ¶ 4. During the email exchange, Joel told Raner that he

9  expected the team would "ship in 6 months but might update the game for 3-6 months afterwards

10  if sales are good and there is [sic] good ideas to add." Dkt. 83-12 at 4. Based on these messages,

11  Raner "understood that this was not a short-term project. Rather, the Hueninks wished to have

12  [him] help them design and develop the game for six months, then anticipated updating the game

13  for three to six more months." Dkt. 83 ¶ 10. Later, in September 2013, Joel attempted to

14  renegotiate Raner's compensation agreement; Raner declined to do so. *Id.* ¶ 13.

15     Raner then "worked intensely in 2013" alongside the Hueninks to "design and develop

16  the game." *Id.* ¶ 11. And despite Joel's initial estimates, Raner ended up working with the

17  Hueninks on the game for nine years. Dkt. 83 ¶ 13. During his time working on the game, "the

18  Hueninks shared responsibilities connected with [Raner's] work . . . and efforts to negotiate with

19  [Raner] concerning the terms governing [his] work." *Id.* "Joel had more specific and frequent

20  communications with [Raner] about the day-to-day aspects of [his] work while Richard focused

21  on discussing big-picture game design and marketing and fundraising for the game, including the

22  implementation and execution of [Raner's] ideas in the Kickstarter campaign," whose purpose

23

24  Raner lived" before 2013 but "had a vague sense that he lived in different states, including
   Arizona and Washington." *See* Dkt. 78 ¶ 4.

ORDER DENYING MOTION TO DISMISS INDIVIDUAL DEFENDANTS AND MOTION FOR LEAVE TO
FILE SUPPLEMENTAL DECLARATION AND CORRECTED BRIEF - 4

was to raise enough funds to allow TFP to sell the game on Steam, the "the largest game sales platform in the world." *Id.* ¶¶ 11, 13.

Richard was responsible for writing and mailing checks to Raner at his Washington residence and setting up direct deposit for Raner. *Id.* ¶ 13 (citing Dkt. 83-8, 83-9, 83-13, 83-14). Generally, "[a]s the CEO of [The Fun Pimps], [Richard] was solely responsible for calculating and sending out payments to Raner." Dkt. 89 ¶ 3. Richard also was Raner's primary point of contact during the parties' dispute over his compensation in 2022, during which he spoke with Raner over email and the phone. Dkt. 53 ¶ 40; Dkt. 83 ¶ 13. During these communications, Richard attempted to negotiate an independent contractor agreement with Raner that would not have included the five percent royalty. Dkt. 83 ¶ 13. According to Raner, this proposed new agreement "referenced [his] Washington state residence." *Id.* On September 26, 2022, Richard wrote to Raner demanding that he sign the new contract no later than September 28, 2023. Dkt. 53 ¶ 43. Raner declined to do so and filed this lawsuit on that date. *Id.* Upon learning of the lawsuit, The Fun Pimps terminated its "relationship" with Raner. *Id.* ¶ 44.

On July 24, 2023, upon receiving leave of court, Raner filed his second amended complaint, adding breach of partnership fiduciary duty and alternative wage claims against the Hueninks, who were previously not named in the lawsuit. *See* Dkt. 52 at 2; Dkt. 53. The partnership claim alleges that Raner and the Hueninks were in a partnership when they worked together and that the five percent royalty agreement was "connected" to the partnership. Dkt. 53 ¶¶ 63–64. Raner asserts that the Hueninks breached their fiduciary duty to him by not "ensuring that [The Fun Pimps] would pay him the royalties that he was entitled by virtue of the parties' agreement," failing "to disclose that they had authorized unapproved deductions to be taken from Raner's royalty payments," and refusing to provide him with an accounting relating to the calculation of his past compensation that he requested in September 2022. Dkt. 53 ¶¶ 69–72.

Raner's wage claim alleges violations of RCW 49.48.010(2), 49.48.010(3), and 49.52.050 against the Hueninks for withholding and "diverting" the wages that Raner alleges he was due under the royalty agreement. *Id.* ¶¶ 83–88.

On August 30, 2023, the Hueninks brought this motion challenging the Court's personal jurisdiction over them.[3] Dkt. 76. Raner filed a response in opposition and the Hueninks replied. Dkt. 84, 88. On October 30, 2023, Raner filed a motion for leave to supplement his declaration and opposition brief to clarify and add more specific information regarding his whereabouts from 2015–2020. Dkt. 98 at 3. The Hueninks filed a response in opposition to the request and Raner replied. Dkt. 100, 103. Both motions are ripe for the Court's consideration.

## II.    DISCUSSION

### A.    Legal Standards

"In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011). To do so, they "need only make a prima facie showing of jurisdictional facts." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004); *see also Data Disc*, *Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977) ("[I]f a plaintiff's proof is limited to written materials, it is necessary only for these materials to demonstrate facts [that] support a finding of jurisdiction in order to avoid a motion to dismiss."). In reviewing the motion, the court accepts "as true all uncontroverted allegations in the complaint." *Global Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020). If the defendant comes forward with a "contradictory affidavit, the plaintiff cannot simply rest on the bare allegations of its complaint." *Yamashita v.*

---

[3] Defendant TFP conceded the Court's personal jurisdiction over it in its answer to the second amended complaint. *See* Dkt. 74 ¶ 13.

*LG Chem, Ltd.*, 62 F.4th 496, 502 (9th Cir. 2023) (citation and internal quotations omitted).

However, "[i]f both sides submit affidavits, then '[c]onflicts between the parties over statements

contained in affidavits must be resolved in the plaintiff's favor.'" *LNS Enters. LLC v. Cont'l*

*Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022) (quoting *Boschetto v. Hansing*, 539 F.3d 1011,

1015 (9th Cir. 2008)); *see Global Commodities*, 972 F.3d at 1106 ("In this posture, we . . .

resolve all genuine factual disputes in the plaintiff's favor.") Moreover, "any evidentiary

materials submitted on the motion are construed in the light most favorable to the plaintiff and all

doubts are resolved in [their] favor." *Ochoa v. J.B. Martin and Sons Farms, Inc.*, 287 F.3d 1182,

1187 (9th Cir. 2002) (citation and internal quotations omitted).

"Where, as here, no federal statute authorizes personal jurisdiction, the district court

applies the law of the state in which the court sits." *CollegeSource, Inc.*, 653 F.3d at 1073 (citing

Fed. R. Civ. P. 4(k)(1)(A)). "Washington's long-arm statute extends the court's personal

jurisdiction to the broadest reach that the United States Constitution permits." *Microsoft Corp. v.*

*Commc'ns & Data Sys. Consultants, Inc.*, 127 F. Supp. 3d 1107, 1113 (W.D. Wash. 2015)

(citing *Byron Nelson Co. v. Orchard Mgmt. Corp.*, 975 P.2d 555 (Wash. App. 1999)).

Accordingly, "the jurisdictional analysis under state law and federal due process are the same."

*Id.* (citing *Schwarzenegger*, 374 F.3d at 800–01); *see also Shute v. Carnival Cruise Lines*, 783

P.2d 78, 82 (Wash. 1989).

Under federal law, personal jurisdiction over a defendant satisfies due process if they

"have certain minimum contacts" with the forum state "such that the maintenance of the suit

does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v.*

*Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)).

"[T]here are two forms that personal jurisdiction may take: general and specific." *Picot v.*

*Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). Because Raner does not argue for general jurisdiction, the Court will only consider the propriety of specific jurisdiction.

The Ninth Circuit applies a three-prong test to determine whether a defendant had sufficient contacts with the forum state to be subject to specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802. The plaintiff bears the burden of establishing the first two prongs. *CollegeSource, Inc.*, 653 F.3d 1076. If they succeed, the burden shifts to the defendant to "set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476–78 (1985)).

The Court must determine whether it has specific jurisdiction for each claim and each defendant individually. *Picot*, 780 F.3d at 1211; *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990). For defendants who are corporate employees, the Court only assesses their individual conduct without imputing to them actions taken by their employer. *Global Commodities*, 972 F.3d at 1109. The Court keeps in mind that "evaluation of the jurisdictional significance of a defendant's contract or other business in the forum is not rigid and formalistic, but rather practical and pragmatic." *Boschetto*, 539 F.3d at 1016.

### B.    Analysis

The Hueninks dispute the Court's jurisdiction over them on the grounds that Raner has not established sufficient facts to prove his partnership and wage claims and that they did not have sufficient minimum contacts with Washington. The Court considers each argument in turn.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

        1.      *Defendants' merits arguments do not govern analysis of personal jurisdiction.*

The Hueninks begin their motion by arguing that the Court does not have personal jurisdiction over them because Raner's claims fail on the merits. *See* Dkt. 76 at 13 ("There is no factual basis for asserting [Raner's partnership and wage] claims, which is a precursor for establishing jurisdiction."). Defendants then argue that the parties were never in a partnership and never had a valid employment agreement and Raner therefore has not provided an adequate factual basis to support his claims.

At the pleading stage, challenges to personal jurisdiction and the merits of the plaintiff's claims are generally governed by different rules and legal standards. *Compare* Fed. R. Civ. P. 12(b)(2) *with* Fed. R. Civ. P. 12(b)(6); *see Cmty. Ass'n for Restoration of the Env't, Inc. v. DeCoster*, 1:19-CV-3110-TOR, 2022 U.S. Dist. LEXIS 21782, at *8 (E.D. Wash. Feb. 7, 2022) ("A motion to dismiss for lack of personal jurisdiction is governed by Federal Rule of Civil Procedure 12(b)(2)."); *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) ("[A] federal court generally may not rule on the merits of a case without *first* determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." (emphasis added)); *cf. Catholic League for Religious and C.R. v. City & Cnty. of S.F.*, 624 F.3d 1043, 1049 (9th Cir. 2010) (en banc) ("Nor can standing analysis, which prevents a claim from being adjudicated for lack of jurisdiction, be used to disguise merits analysis, which determines whether a claim is one for which relief can be granted if factually true.").

Defendants' motion and reply do not cite any authority supporting their proposition that personal jurisdiction necessarily involves an evaluation of the merits of the plaintiff's underlying claims. While the Ninth Circuit has acknowledged that in certain cases "jurisdictional facts" may

be "intertwined with the merits" such that "a decision on the jurisdictional issues is dependent on a decision of the merits," *Data Disc*, 557 F.2d at 1289 n.2, that is not the case here. Defendants instead raise their personal jurisdiction arguments in the *alternative* to their merits arguments and the Court finds that determination of the former is not dependent on evaluation of the latter. *See* Dkt. 76 at 13 ("[E]ven if there was a factual basis for the claims, neither Richard nor Joel had sufficient contacts with Washington for this Court to exercise jurisdiction over them."). Moreover, even if the analyses were interdependent, in such cases "it is preferable that this determination be made at trial," although courts may also determine the issue at a "plenary pretrial proceeding" or on summary judgment. *Data Disc*, 557 F.2d at 1285 n.2, 1289 n.6.

The Hueninks bring their motion under Rule 12(b)(2) to challenge the Court's personal jurisdiction over them. Dkt. 76 at 7. Because the personal jurisdiction analysis in this case is not interrelated with the merits of Raner's claims, the Court will rule on the motion using the standards and rules for personal jurisdiction. *See Mem'l Hermann Hosp. Sys. v. S. Nat'l Life Ins. Co.*, No. H-10-0121, 2010 WL 1268064, at *4 (S.D. Tex. Mar. 25, 2010) (rejecting a defendant's attempt to sustain a Rule 12(b)(2) motion to dismiss by making merits arguments).

> 2.    *The Hueninks are subject to personal jurisdiction in Washington for Raner's partnership and wage claims.*

As stated, the Court considers a three-prong test in deciding whether it has specific jurisdiction over the Hueninks. *Schwarzenegger*, 374 F.3d at 802. The Court considers each in turn.

> a)    *The Hueninks have purposefully availed themselves of the privilege of conducting activities in Washington.*

The first specific jurisdiction prong may be analyzed under one of two tests: purposeful availment or purposeful direction. *See id.* "A purposeful availment analysis is most often used in suits sounding in contract," while "[a] purposeful direction analysis . . . is most often used in

ORDER DENYING MOTION TO DISMISS INDIVIDUAL DEFENDANTS AND MOTION FOR LEAVE TO FILE SUPPLEMENTAL DECLARATION AND CORRECTED BRIEF - 10

suits sounding in tort." *Id.* However, the Ninth Circuit has endorsed the use of the purposeful availment test for claims that sound in tort but "arise out of the [plaintiff]'s contractual relationship with the defendants." *Sher*, 911 F.2d at 1362 (holding that tort claims relating to the alleged incompetence of the plaintiff's attorneys arose out of the plaintiff's contractual relationship with them).

The parties agree that Raner's wage claim is a contract claim that should be analyzed under the purposeful availment standard but disagree as to which test should be applied to the partnership claim, which the parties agree sounds in tort.[4] The Hueninks do not directly address whether the partnership claim "arises out of" the parties' contractual relationship such that the availment test should apply.

The Court finds that application of the availment standard is proper. In deciding to apply the availment test in a case involving tort and contract claims, the Southern District of California emphasized that while the plaintiff's complaint in that case "allege[d] both breach of contract and tort claims, each of the claims [were] premised on Defendants' alleged broken contractual promises, and for each of the claims, the First Amended Complaint allege[d] that Plaintiff was damaged in the form of lost 'transactional fees, monthly fees, commissions and other income.'" *NationalEFT, Inc. v. Checkgateway*, No. 12-cv-1498–WQH–JMA, 2013 WL 593759, at *7 (S.D. Cal. Feb. 15, 2013) (citing *Boschetto*, 539 F.3d at 1016). Similarly, here, Raner's second amended complaint alleges that the Hueninks breached their fiduciary duty to him by not "ensuring that TFP would pay him the royalties that he was entitled by virtue of the parties' agreement," failing "to disclose that they had authorized unapproved deductions to be taken from Raner's royalty payments," and refusing to provide him with an accounting of TFP's payments

---

[4] Raner argues in the alternative that jurisdiction still exists for the partnership claim even if the Court were to use the direction test.

to him. Dkt. 53 ¶¶ 69–71. Raner's breach of contract claim also contains allegations of TFP's failure to pay the correct amount he was due and failure to provide accounting of past payments. *Id.* ¶¶ 47–48. Raner's partnership claim therefore arises out of the Hueninks' alleged breach of their contract for royalties. The Court will apply the availment test for both the partnership and wage claims.

For the court to have jurisdiction on a theory of purposeful availment, the defendant must have taken "some act by which [it] purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (U.S. 2021). The test is met if "the defendant has taken deliberate action within the forum state or if he has created continuing obligations to forum residents." *Ballard v. Savage,* 65 F.3d 1495, 1498 (9th Cir.1995); *see also Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987) (noting that a defendant is not required to have had physical contact with the forum state to be subject to personal jurisdiction there). "So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King*, 471 U.S. at 475 n.18. However, "random, fortuitous, or attenuated contacts" do not suffice. *Id.* at 475 (internal quotations omitted).

Entering a contract with a state's resident does not on its own subject the defendant to personal jurisdiction there. *IDC Logistics Inc. v. DILE Sols. LLC*, No. CV 22-8690-MWF, 2023 U.S. Dist. LEXIS 128050, *9 (C.D. Cal. June 16, 2023) (citing *Burger King*, 471 U.S. at 478). Rather, for claims arising out of contractual relationships, courts consider: (i) prior negotiations, (ii) contemplated future consequences, (iii) the terms of the contract, (iv) and the parties' actual course of dealing. *Sher*, 911 F.2d at 1362 (quoting *Burger King*, 471 U.S. at 479). Exercise of jurisdiction over a defendant in a contract case is appropriate if the defendant formed a

ORDER DENYING MOTION TO DISMISS INDIVIDUAL DEFENDANTS AND MOTION FOR LEAVE TO FILE SUPPLEMENTAL DECLARATION AND CORRECTED BRIEF - 12

"deliberate affiliation with the forum State" and if "possible litigation there" was reasonably foreseeable. *See Burger King*, 471 U.S. at 482.

First, the Court finds that Joel's contacts with Washington are sufficient to subject him to personal jurisdiction for the wage and partnership claims. The parties disagree as to whether Joel became aware of Raner's residence in Washington before Joel hired Raner to work on the game based on Raner informing him that he had moved back to his "hometown." Dkt. 83-10 at 2. To support his position, Raner attested in his declaration that he had previously mentioned to Joel that he was from Washington in conversations they "had over the years," Dkt. 83 ¶ 9, and, as an example, attached to his declaration an email he wrote to Joel in 2006 in which he told Joel that he was "back in Washington with family." Dkt. 83-11 at 2. While Joel disputes that he knew of Raner's Washington residence when he hired Raner, he admits that he previously "had a vague sense that [Raner] lived in different states, including Arizona and Washington." Dkt. 78 ¶ 4. Given that the Court must construe all evidence in the light most favorable to Raner and resolve factual disputes in his favor, the Court assumes for purposes of deciding this motion that Joel was aware that Raner had moved to and was living in Washington when Joel hired him to work on the game. *See Global Commodities*, 972 F.3d at 1106; *Ochoa*, 287 F.3d at 1187. Thus, Joel's recruitment of, and continuing working relationship with Raner created "foreseeable consequences" in Washington. *See Burger King*, 471 U.S. at 480–82 (finding the defendant's knowledge of the plaintiff corporation's location in the forum state, as evidenced by the terms of the contract and the parties' actual course of dealing, showed that defendant formed a "deliberate affiliation" with the forum state); *Global Commodities*, 972 F.3d at 1107 (noting that, in *Burger King*, "the Court held that because Burger King and the franchisee had agreed to an ongoing business relationship with foreseeable consequences in Florida, the franchisee was amenable to suit there.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

The duration and amount of the defendant's contacts with the forum state are relevant to the purposeful availment analysis in contract cases. *See Burger King*, 471 U.S. at 475–76 ("[W]here the defendant deliberately . . . has created *continuing* obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there." (emphasis added) (internal citations and quotations omitted)); *Global Commodities*, 972 F.3d at 1108 ("In cases where we have held that a contract between a forum resident and a non-resident did not give rise to specific jurisdiction in the forum, we have done so because the business relationship between the parties was *fleeting* or its center of gravity lay elsewhere." (emphasis added)); *id.* at 1109 ("Bachosa maintained *numerous* contacts with California during the course of its *years-long* business relationship with Global. Those contacts gave rise to this dispute, and it was reasonable for Bachosa to expect that it would be haled into court in California to fulfill its obligations and to account for harm it foreseeably caused there." (emphasis added)); *Johnson v. Peter*, No. C21-1602-LK, 2023 WL 22021, at *3 (W.D. Wash. Jan. 3, 2023) (finding personal jurisdiction proper where the defendant had "persistent contacts" with the forum state by "conduct[ing] business in Washington by soliciting money and a contract from the [plaintiffs] through multiple phone calls, emails, and text messages while the Johnsons resided in Washington" and "continually" contacting the plaintiffs with promises to make payments towards a promissory note that he defaulted on); *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1359 (Fed. Cir. 1998) ("The 'minimum contacts' test examines the number and nature of a defendant's contacts with the forum.").

Here, Joel had numerous contacts with Raner during times when Raner was a resident of Washington over the course of nine years working on "7 Days to Die." Joel solicited Raner to work on the game, provided him with updates on the game's development, agreed to pay Raner a five percent royalty in the game's sales, and informed Raner that the group planned to work on

the game for nine months to a year following the formation of the royalty agreement. Joel also attempted to renegotiate the compensation agreement shortly after it was made. Dkt. 83 ¶ 13. Moreover, while Joel's direct involvement with Raner's compensation was more limited than Richard's, in 2013, Joel asked for Raner's address "for the initial royalty checks" – to which Raner responded with his Washington address – and "followed up to confirm that [Raner] had received the first check." Dkt. 83 ¶ 12–13. Throughout the parties' working relationship, which lasted for about nine years, Joel provided him with instructions and communicated with him "about the day-to-day aspects of [his] work." *Id.* The Hueninks describe Joel as being "Raner's primary work contact." Dkt. 88 at 9 n.2 (citing Dkt 77 ¶¶ 6–7).

Courts have found the exercise of personal jurisdiction over non-resident employers of forum residents in similar cases to be appropriate. In *Failla v. FixtureOne Corp.*, the plaintiff sued the CEO of her former employer for "wilfull withholding of wages" for work she had performed remotely for "over two years" while residing in Washington for the defendant, who was based in Pennsylvania. 336 P.3d 1112, 1114–15, 1117 (Wash. 2014), *cert. denied*, 575 U.S. 985 (2015). The Washington Supreme Court held that the defendant's "hiring, firing, promotion, and payment of Failla's wages" constituted sufficient minimum contacts to justify exercise of personal jurisdiction. *Id.* at 1118. The court also noted that the defendant "appeared to be" the plaintiff's "primary contact" at the company. *Id.* at 1117. Similarly, Joel hired Raner, attempted to renegotiate his compensation agreement after it was formed, helped facilitate his initial royalty payments, and generally served as Raner's "primary contact" at TFP. The extent of Joel's contacts over the course of many years and their relation to the Hueninks' alleged failure to pay Raner properly under the agreement that Joel negotiated, which is central to both claims, is sufficient for Joel to "have reasonably foreseen that [he] would be haled into [Washington's] courts if [his] actions caused harm there." *Global Commodities*, 972 F.3d at 1110; *see also Hall*

1    *v. L-3 Commc'ns Corp.*, 170 F. Supp. 3d 1316, (E.D. Wash. 2016) (exercise of personal

2    jurisdiction was proper over a defendant company where the plaintiff "applied for employment

3    with [the defendant] while living in Washington, . . . was interviewed by telephone and hired

4    while in Washington, and . . . was paid in Washington."); *Cannon v. Commc'n Components, Inc.*,

5    2020 WL 433351, at *5 (W.D. Wash. Jan. 28, 2020) ("An employer that intentionally hires an

6    employee residing in a specific state to work in that, and other, states would certainly seem to

7    form minimum contacts by invoking 'the benefits and protections of' that state's laws.").[5] The

8    Court has personal jurisdiction over Joel for Raner's wage and partnership claims.

9          Richard's contacts with Washington relating to Raner's claims are also sufficient to

10   subject him to jurisdiction here. First, while Joel's declaration disclaims any involvement "in

11   determining Raner's compensation amounts or otherwise sending compensation to him," Dkt. 78

12   ¶ 7, Richard's supplemental declaration admits that "As the CEO of TFP, [he] was solely

13   responsible for calculating and sending out payments to Raner." Dkt. 89 ¶ 3. In addition, he does

14   _____

15   [5] *Cannon* declined to extend personal jurisdiction over individual defendants because their
     relevant contacts with Washington were only "related to their business obligations" and "not in
16   their personal capacities," citing to two Ninth Circuit cases for support. *Cannon*, 2020 WL
     433351, at *5 (first citing *Kransco Mfg., Inc. v. Markwitz*, 656 F.2d 1376, 1379 (9th Cir. 1981);
17   then citing *Forsythe v. Overmyer,* 576 F.2d 779, 782 (9th Cir. 1978)). However, after *Cannon*
     was decided, the Ninth Circuit clarified that the rule from those cases prohibiting exercise of
18   jurisdiction over corporate employees for actions taken in their official capacities is no longer
     good law in light of more recent Supreme Court precedent. *Global Commodities*, 972 F.3d at
19   1108 ("Not all of our holding in *Forsythe* survived the Supreme Court's subsequent decisions in
     *Calder* and *Keeton*. Our statement in *Forsythe* that 'a corporate officer who has contact with a
20   forum only with regard to the performance of his official duties is not subject to personal
     jurisdiction in that forum,' is clearly irreconcilable with the Supreme Court's decisions
21   subjecting corporate employees to suit in exactly those circumstances." (citations omitted)).
     Moreover, much like in *Global Commodities*, where the Ninth Circuit subjected two individual
22   defendants to jurisdiction in part because California's long-arm statute did not preclude the
     exercise of jurisdiction over corporate officers, the Washington Supreme Court in *Failla* held
23   that Washington's long-arm statute also contains no such limitation. *See* 336 P.3d at 1116 ("[A]n
     officer or employee is not automatically shielded from personal jurisdiction just because his
24   contacts occurred in the context of his employment." (citing *Calder v. Jones,* 465 U.S. 783, 790
     (1984)).

ORDER DENYING MOTION TO DISMISS INDIVIDUAL DEFENDANTS AND MOTION FOR LEAVE TO
FILE SUPPLEMENTAL DECLARATION AND CORRECTED BRIEF - 16

not contradict Raner's allegations in the second amended complaint that Richard also failed to "ensure that Raner was paid the amounts that he was owed by TFP," *see* Dkt. 53 ¶ 70, was responsible "for payment of employee wages," *id.* ¶ 82, and "did not pay Raner's earned wages when they became due or even before his termination." *See id*; Dkt. 77. In deciding this motion, the Court assumes that Richard was responsible for calculating and paying Raner's wages, including in the years leading up to Raner's termination when Raner alleges he was paid less than what he was due under the royalty agreement, Dkt. 53 ¶¶ 40, 80 ("Richard did indicate, however, that, at least in more recent years, TFP had not paid Raner 5% of sales as agreed, and that, as late as 2021, TFP had started making additional new deductions above and beyond the limited start-up expenses discussed in 2013."). *See Global Commodities*, 972 F.3d at 1106 (in ruling on motions to dismiss for lack of personal jurisdiction, courts "take as true all uncontroverted allegations in the complaint.").

Thus, Richard had relevant contacts with Washington relating to the wage and partnership claims through his calculation and payment of Raner's wages when TFP allegedly paid him less than he was due, being Raner's primary contact with TFP during the wage dispute in 2022, declining to provide Raner with an accounting to show him how his past payments were calculated during the dispute, and attempting to persuade Raner to sign a new agreement that omitted the previously agreed upon five percent royalty. Richard was aware that Raner resided in Washington by at least June 1, 2013—towards the very beginning of their working relationship and well before the 2022 contract dispute—when Raner provided a W-9 form to TFP that included his Washington address. Dkt. 88 at 3 (citing Dkt. 77 ¶ 4). Richard also shared "confidential sales information" with Raner in 2013 "to indicate that Raner was receiving a % share of the net profits from the game as his compensation." Dkt. 77 ¶ 6. Additionally, Richard maintained a long-term connection with Raner through supervision of his work, focusing "on

discussing big-picture game design and marketing and fundraising for the game." Dkt. 83 ¶ 13. Thus, Richard's contacts with Raner were long-term and had an especially close relationship to the events giving rise to both claims at issue because he was the one responsible for what Raner alleges to be the errant calculation and payment of his wages.

Richard's contacts with Washington also share similarities with the defendant in *Failla*; he was TFP's CEO since April 2013, was responsible for Raner's compensation when the disputed payments were made, tried to persuade Raner to agree to a new wage agreement, and was Raner's point of contact during the dispute that led to Raner's firing. *See* 336 P.3d at 1118 ("Schutz was the officer directly responsible for the hiring, firing, promotion, and payment of Failla's wages."). Accordingly, Richard had a "continuing obligation" to pay Raner, a Washington resident, and he could have "reasonably foreseen" that failing to do so in accordance with the parties' agreement would subject him to litigation in Washington. *See Burger King*, 471 U.S. at 475–76; *Global Commodities*, 972 F.3d at 1110 ("Global presented evidence that Andonie and Jarufe were key players in Bachosa's years-long business relationship with Global and that they personally assumed liability for Bachosa's obligations under the note. In these circumstances, they 'could have reasonably foreseen that they would be haled into [California's] courts' if their actions caused harm there." (citations omitted)). The Court has personal jurisdiction over Richard for Raner's wage and partnership claims.[6]

---

[6] In their reply brief, the Hueninks request jurisdictional discovery "on the issue of Raner's whereabouts during 2012 and 2013." Dkt. 88 at 7. The reply also requests an opportunity to present the evidence produced at an evidentiary hearing, "if necessary." *Id.* at 16. Additionally, their response to Raner's motion for leave to file a supplemental declaration and corrected brief in opposition to the Hueninks' motion to dismiss, Dkt. 98, asks for the first time for leave to file a surreply relating to the residency issue. Dkt. 100 at 4. The Hueninks argue that additional discovery, briefing, and a possible evidentiary hearing are needed because Raner has made inconsistent statements regarding his residency at the time he was recruited and hired by Joel. Specifically, they argue that his claims to residency in Washington in his declaration contradict

1

2

          *b)*    *Raner's wage and partnership claims arise out of or relate to the Hueninks' forum-related activities.*

3

      The second prong of the specific jurisdiction test requires the Court to determine whether

4

the claims at issue arose out of or related to the Hueninks' forum contacts. *Yamashita*, 62 F.4th at

5

504. "[F]or a claim to arise out of a defendant's forum contacts requires" a showing of but-for

6

causation. *Id.* at 504–06. Here, the Hueninks' contacts were but-for causes of the wage and

7

partnership claims; had Joel not hired Raner and agreed to pay him a five percent royalty, and

8

had Richard not failed to pay him the agreed wage, Raner would not have had claims against

9

them for failure to pay the correct wage under the agreement. Raner has shown the second prong.

10

          *c)*    *Exercise of jurisdiction over the Hueninks is reasonable.*

11

      Because Raner has established the first two prongs, the burden shifts to the Hueninks to

12

"set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable."

13

*CollegeSource, Inc.*, 653 F.3d at 1076.

14

> [Courts] consider the following seven factors when making this determination:
> (1) the extent of the defendants' purposeful interjection into the forum state's
> affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of
> conflict with the sovereignty of the defendants' state; (4) the forum state's interest
> in adjudicating the dispute; (5) the most efficient judicial resolution of the

15

16

---

17

his response to an interrogatory—in which he recollects working for his former Arizona-based
employer, GameVizions, until October 2013, Dkt. 79-1 at 5—and a July 2013 email he sent to
the Hueninks stating that he had "recently left" GameVizions and would soon be done "taking
care of things in Arizona" and "getting [his] workstation set up back in Washington again." Dkt.
77-1 at 2. The Court "has the discretion to take evidence at a preliminary hearing" if the
"pleadings and other submitted materials raise issues of credibility or disputed questions of fact
with regard to jurisdiction." *Data Disc*, 557 F.2d at 1285. First, the Court does not agree that
Raner's declaration testimony regarding his residence in Washington in October 2012, Dkt. 83 ¶
7, necessarily contradicts the two earlier statements that the Hueninks point to; that he may have
worked for GameVizions or moved his belongings to Washington in 2013 does not necessarily
mean he was living in Arizona at that time. In addition, it is unclear why there is a need for a
court order to authorize additional discovery given that discovery in this case does not close until
February 24, 2024. Dkt. 97 at 2. Should the Hueninks conduct additional discovery that would
affect the Court's analysis of jurisdiction, they are free to raise the issue again at summary
judgment or at trial. The Hueninks' requests for jurisdictional discovery, an evidentiary hearing,
and leave to file a surreply are denied.

18

19

20

21

22

23

24

ORDER DENYING MOTION TO DISMISS INDIVIDUAL DEFENDANTS AND MOTION FOR LEAVE TO
FILE SUPPLEMENTAL DECLARATION AND CORRECTED BRIEF - 19

controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007).

> [I]t is not enough that the [defendant] demonstrate that some other forum is more reasonable than [the forum state], it must show a due process violation; it must show that jurisdiction in [the forum state] would make the litigation "so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent."

*Sher*, 911 F.2d at 1365 (quoting *Burger King*, 471 U.S. at 478).

The first factor generally weighs in favor of Raner, as some of the Hueninks' relevant contacts with Raner lasted for most or the entirety of their nine-year working relationship. *Cf. id.* at 1364 (finding that "the extent of [the defendant's] interjection into California affairs" was not great where they only made "*a few* phone calls and trips to" the forum state (emphasis added)).

The second factor is neutral. The Hueninks argue that "Richard would be forced to defend himself roughly 2,000 miles from his residence in Texas and Joel roughly 1,600 miles from his residence in Nebraska." Dkt. 76 at 31. However, the Ninth Circuit has noted that "modern advances in communications and transportation have significantly reduced the burden of litigating in another [forum]." *Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp.*, 905 F.3d 597, 608 (9th Cir. 2018); *see also Sher*, 911 F.2d at 1365 (Even "[i]n th[e] era of fax machines and discount air travel, requiring" a Florida-based partnership "to defend itself in California under the circumstances as it alleges them would not be so unreasonable as to violate due process."). Moreover, the parties have agreed to take depositions remotely, further reducing any burden on the Hueninks associated with travel. Dkt. 24 at 3. Thus, while the burden and cost to the Hueninks is not insignificant, the anticipated little travel they may have to do, on its own, is not enough to weigh against a finding of jurisdiction.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Third, the Hueninks do not point to any conflicts with the sovereignty of their home states and concede that this factor is neutral. Dkt. 76 at 31. Raner argues that this factor weighs in his favor but does not provide any explanation as to why. Dkt. 84 at 20. Accordingly, the Court regards this factor as being neutral.

The fourth factor weighs in favor of Raner because he was in Washington when at least some of the harm from the alleged underpayments occurred. *Johnson*, 2023 WL 22021, at *3 ("The Johnsons felt the effects of defendant's alleged breach in Washington, and thus Washington retains some interest in providing plaintiff a forum for redress." (internal quotations and citations omitted)).

Next, the fifth factor, which pertains to location of evidence and witnesses, weighs in favor of the Hueninks. Most of the witnesses and documents would likely come from Texas (where TFP is headquartered and Richard lives), Nebraska (where Joel resides), or Germany (where TFP's former owner lives). However, this factor is "no longer weighed heavily given the modern advances in communication and transportation." *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998).

The sixth factor favors jurisdiction because Raner lives in Washington and worked for TFP remotely. *See Johnson*, 2023 WL 22021, at *3 ("[T]his District provides the [plaintiffs] the most convenient and effective relief because they live here and because they do not appear to have expected any need to travel to Florida as part of their business dealings with [the defendant].").

Finally, the seventh factor requires the plaintiff to show the unavailability of an alternative forum. *Freestream Aircraft*, 905 F.3d at 609. Raner concedes that "Nebraska and Texas are available as potential forums." Dkt. 84 at 16. Accordingly, this factor weighs in favor of the Hueninks.

ORDER DENYING MOTION TO DISMISS INDIVIDUAL DEFENDANTS AND MOTION FOR LEAVE TO FILE SUPPLEMENTAL DECLARATION AND CORRECTED BRIEF - 21

The Court finds that application of the balancing test is slightly in Raner's favor "or, at best, is a wash." *Freestream Aircraft*, 905 F.3d at 609 (internal quotations and citations omitted). Given the heavy burden on the Hueninks to make a "*compelling* case" that jurisdiction is unreasonable, *CollegeSource, Inc.*, 653 F.3d at 1076 (emphasis added), the Court finds that the third specific jurisdiction prong supports exercise of personal jurisdiction.

Having found that all three parts of the specific jurisdiction test are satisfied, the Court holds that exercise of personal jurisdiction over the Hueninks for Raner's partnership and wage claims is proper.[7]

### III.    CONCLUSION

For the foregoing reasons, Defendants Joel and Richard Hueninks' motion to dismiss individual defendants, and their request for attorneys' fees therein, Dkt. 76, is DENIED. Furthermore, Defendants' requests for jurisdictional discovery, an evidentiary hearing, Dkt. 88, and leave to file a surreply, Dkt. 100, are also DENIED. Plaintiff Ryan Raner's request for leave to file supplemental information is DENIED as MOOT. Dkt. 98.

---

[7] On October 30, 2023, Raner moved for leave to file a supplemental declaration and corrected brief in opposition to the Hueninks' motion to dismiss. Dkt. 98. The motion to supplement clarifies "that the facts regarding Raner's residence between the years of 2015 and 2020 were more nuanced than as reflected in Raner's Declaration and Opposition." *Id.* at 3. The Hueninks filed a brief in opposition to the motion and Raner replied. Dkt. 100, 103. The Court finds that the additional information provided by Raner does not materially affect its analysis of the personal jurisdiction issue, as the Hueninks' relevant contacts mostly occurred outside of the window of time for which Raner provides clarification. Moreover, while a plaintiff's residence can "enhance" a defendant's contact with the forum, it "is not a separate requirement, and lack of residence will not defeat jurisdiction established on the basis of defendant's contacts." *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 780 (1984). Accordingly, the motion to supplement is denied as moot.

Dated this 17th day of November, 2023.

Tiffany M. Cartwright
United States District Court Judge