UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RYAN RANER,<br><br>                    Plaintiff,<br><br>        v.<br><br>THE FUN PIMPS ENTERTAINMENT LLC;<br><br>RICHARD HUENINK; JOEL HUENINK,<br><br>                    Defendant. | Case No. 3:22-cv-05718-TMC<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' FIRST MOTION FOR SUMMARY JUDGMENT |

Before the Court is Defendants The Fun Pimps Entertainment LLC, Richard Huenink, and Joel Huenink's first motion for summary judgment.[1] Dkt. 107. For the following reasons, the motion is GRANTED IN PART AND DENIED IN PART.

## I.       BACKGROUND

Plaintiff Ryan Raner is a video game developer who worked for Defendants Joel and Richard Huenink and their company Defendant The Fun Pimps Entertainment, LLC as a "prop artist" on a "zombie hoard survival-themed video game" called "7 Days to Die" between 2013 and 2022. Dkt. 53 ¶¶ 1, 78; Dkt. 111 ¶ 8, 18; Dkt. 106 at 14. This case concerns a dispute over Raner's compensation agreement.

Raner had been interested in working in the video game industry since 2003, soon after he graduated high school. *See* Dkt. 111 ¶ 1. Around that time, he met the Hueninks, "older, sophisticated veterans of the video game industry," *id.* ¶ 2, through game forums the Hueninks ran for their former game development company, 4D Rulers Software, Inc. Dkt. 53 ¶¶ 16– 17.

---

[1] Defendants filed a second motion for summary judgment on March 7, 2024. Dkt. 166.

1
2
3
4
5
6

Over the next several years, Raner worked with the Hueninks on various video game projects for 4D Rulers and "third parties who Joel had sourced the work from." Dkt. 111 ¶¶ 2–6. The parties hoped these projects would "mak[e] [them] all rich" or, "at the very least, raise enough money to allow [them] to work exclusively on a video game development project together." *Id.* ¶¶ 3–4. However, these hopes did not materialize, and the parties parted ways in 2008. *Id.* ¶ 6. But Raner and Joel "stayed in touch." *Id.*

7
8
9
10
11
12
13
14

In December 2012, Joel reached out to Raner over Facebook Messenger to solicit Raner to work on "7 Days to Die." Dkt. 111-1 at 2.[2]  Raner responded that he was interested. *Id.* at 3. On January 18, 2013, Joel emailed Raner to offer him a one to five percent "royalty" to "share with [him] for [his] effort, depending on how much free time" he had. Dkt. 111-2 at 2. Raner responded that he could "probably put in several hours a week" and asked Joel how many hours per week he would have to work for a five percent royalty. Dkt. 111-3 at 2. Joel responded that he would want "about 20 hours a week or more for that." Dkt. 111-4 at 3. Raner responded that he was "on board" and that "20 hours a week" was "pretty doable." Dkt. 111-5 at 2.

15
16
17
18
19
20
21
22

In the exchange, the parties never agreed that Raner was entitled to periodic payments or to any specific payment schedule prior to Raner's completion of the services he agreed to provide. They also did not set a definitive end date for Raner's services and did not specify any temporal limitation on Raner's entitlement to the "royalty." *See generally* Dkt. 111-1, 111-2, 111-3, 111-4, 111-5. Richard attests in multiple declarations that during the parties' working relationship, Raner was paid either monthly or quarterly. *See* Dkt. 77 ¶ 14; Dkt. 130 ("Raner's payments were 5% of the total amount I calculated for distribution for a particular month or quarter."); Dkt. 141 ¶ 8 (stating that, in January 2018, Richard came to an agreement with Raner

23
24

---

[2] At the time, the game, which was still in its early stages of development, was being referred to as "Thirty Days to Die." *See* Dkt. 111-1 at 2.

that he would be paid quarterly, rather than monthly). Raner states in an interrogatory answer attached to his response brief that the terms of the original written agreement "were never amended." *See* Dkt. 111-6 at 4.

"The TFP legal entity, a Texas limited liability company, was formed on April 19, 2013," as a "member-managed LLC" with Richard, Joel, and Christian Lang as its only three members. Dkt. 108 ¶ 4. Richard is The Fun Pimps's "co-founder, owner, and the Chief Executive Officer," Dkt. 108 ¶ 2, and Joel is a "co-founder and owner," Dkt. 142 ¶ 2.

Raner received his first payment for working on "7 Days to Die" in May 2013. Dkt. 111 ¶ 9. Before the payment was made, Richard emailed Raner and others working on the game, stating that they were "preparing [their] first payroll from . . . May pre-orders net profits after expenses." Dkt. 30-1 at 2. He continued, "FYI for Joey and Ryan expenses like forming an LLC, paying for a website and licensing Unity will come out first you won't be paying for my new car or anything stupid like that." *Id.* Later, on July 14, 2013, Raner contacted Joel on Skype instant messenger to ask about the calculations for his royalty payments. Joel explained that "every dime that comes in goes into the account. *[T]hen we pay for expenses* like unity engine, paying sub contractors, lawyer fees etc, then we get our %'s after that." Dkt. 129-1 at 1 (emphasis added). Later in the conversation, he continued: "whate[v]er we sell for doesn't matter, its [sic] gross money earned, *minus expenses * .05.*" *Id.* at 2 (emphasis added). Raner attests that he was "never given any accountings showing how [his] royalty payments were calculated." Dkt. 111 ¶ 11.

Raner worked for The Fun Pimps and the Hueninks continuously until 2022. *See* Dkt. 111 ¶ 18. Raner describes his working relationship with Defendants as follows:

> While I was working on the game, TFP identified the tasks that I was to perform, often providing the specifics of how the task was to be completed. For example, the Hueninks would often provide me with a sample piece of game art that they wanted me to duplicate or modify. They also gave me specific instructions as to sizing, color, style, or method of creating the art. While I had some freedom to work on

my own ideas for the game, the Hueninks prioritized the tasks that I worked on. Early on, prioritization was done via emails or chat messages in which I was told the items on Richard's list that were the highest priority.

Dkt. 111 ¶ 25.

In December 2021, Raner noticed that one of his royalty payments was less than he expected. Dkt. 111 ¶ 12. At first, Raner was not concerned because his "royalty agreement didn't provide a specific timeframe for [his] payments and TFP's payments didn't follow a strict schedule" and he expected that the low payment would be made up for in "subsequent royalty payments." *See id.* ¶ 12. In July 2022, after he realized his low payment had not been "rectified" by later payments, Raner requested "an accounting from TFP's payroll department regarding how it had calculated and paid [his] royalties and to provide [him] with gross sales numbers." *See id.* ¶ 13. According to Raner, Defendants declined and informed him that "as late as 2021, TFP had started making additional new deductions above and beyond the limited start-up expenses discussed in 2013." *Id.* ¶ 14. After rejecting a new contract arrangement offered by Defendants, Raner filed this lawsuit on September 28, 2022, and Defendants terminated the parties' working relationship. *Id.* ¶¶ 14–18; Dkt. 1.

Raner brings claims for breach of contract against The Fun Pimps, Dkt. 53 ¶¶ 45–50; declaratory judgment against The Fun Pimps, *id.* ¶¶ 51–57; an equitable claim for accounting against The Fun Pimps, *id.* ¶¶ 58–61; breach of fiduciary duty (arising from an alleged partnership agreement) against the Hueninks, *id.* ¶¶ 62–74; and alternative wage claims against The Fun Pimps and the Hueninks, *id.* ¶¶ 75–89. Raner's claims center around Defendants' alleged failure to correctly pay Raner a five percent royalty from the gross sales of "7 Days to Die," without expenses deducted, and Defendants' alleged refusal to provide Raner with an accounting of how they calculated his payments throughout his working relationship with them.

1    For relief, Raner requests compensatory damages, exemplary damages pursuant to RCW

2    49.52.050 and RCW 49.52.070, and a declaratory judgment. *Id.* at 16.

3    On November 23, 2023, Defendants filed the instant motion seeking entry of summary

4    judgment on all of Raner's claims. Dkt. 107. Raner responded and Defendants replied. Dkts. 110,

5    112. The Court heard oral argument on the motion on February 1, 2024. Dkt. 126. On February

6    23, 2024, the Court granted Defendants' request to supplement their reply with evidence of the

7    July 2013 Skype exchange between Joel and Raner. Dkt. 157. The motion is ripe for the Court's

8    consideration.

9    **II.    DISCUSSION**

10   **A.  Legal Standards**

11   "The court shall grant summary judgment if the movant shows that there is no genuine

12   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

13   Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable

14   jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281

15   F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

16   (1986)). The moving party may fulfill its initial burden of production by "'showing'—that is,

17   pointing out to the district court—that there is an absence of evidence to support the nonmoving

18   party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), or by producing "evidence

19   negating an essential element of the nonmoving party's claim." *Nissan Fire & Marine Ins. Co.,*

20   *Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its

21   initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts

22   showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. To do so, they must

23   present "some 'significant probative evidence tending to support the complaint.'" *Gen. Bus. Sys.*

24   *v. N. Am. Philips Corp.*, 699 F.2d 965, 971 (9th Cir. 1983) (quoting *First Nat'l Bank of Ariz. v.*

*Cities Serv. Co.*, 391 U.S. 253, 290 (1968)). To carry their ultimate burden of persuasion, the movant "must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102. The movant is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof at trial. *Celotex*, 477 U.S. at 323.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Therefore, in ruling on a motion for summary judgment, "a District Court must resolve any factual issues of controversy in favor of the non-moving party," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (internal quotations omitted), and view the evidence in the light most favorable to it, *Anderson*, 477 U.S. at 255. But conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be presumed. *See Lujan,* 497 U.S. at 889.

The evidence relied upon by the nonmoving party must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). Interrogatory answers are competent evidence on summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(A).

**B.     Analysis**

"Where the issue of limitations involves determinations [of when a claim begins to accrue], summary judgment cannot be granted unless the evidence is so clear that there is no genuine factual issue." *Lundy v. Union Carbide Corp.*, 695 F.2d 394, 397–98 (9th Cir. 1982); *see also Goodman v. Goodman*, 128 Wn.2d 366, 373, 907 P.2d 290 (Wash. 1995) ("Whether the statute of limitations bars a suit is a legal question, but the jury must decide the underlying factual questions unless the facts are susceptible of but one reasonable interpretation."). Defendants argue that the Court should grant summary judgment for Raner's claims for breach of contract, declaratory judgment, accounting and breach of fiduciary duty as barred by the

statute of limitations and that his claim for "perpetual royalties" is barred under the statute of frauds. Raner contests each argument and argues in the alternative that equitable tolling is appropriate for any claims that are otherwise barred by the statute of limitations. The Court considers each argument in turn.

### 1. Breach of Contract, Declaratory Judgment, Accounting, and Statutory Wage Claims[3]

"Statutes of limitations do not begin to run until a cause of action accrues." *1000 Va. Ltd. P'ship v. Vertecs*, 158 Wn.2d 566, 575, 146 P.3d 423 (Wash. 2006). Generally, a cause of action accrues "when the party has the right to apply to a court for relief." *Id.* Accrual of a breach of contract claim occurs on breach. *Id.* In Washington, a contract action is subject to a six-year statute of limitations if based on a written contract, RCW § 4.16.040(1), and a three-year statute of limitations for an oral contract, § 4.16.080(3).

Invoking these rules, Defendants maintain that Raner's breach of contract, wage, accounting, and declaratory judgment claims accrued at least by May or July 2013, when

---

[3] The parties incorporate their statute of limitations arguments regarding the breach of contract claim in their arguments regarding Raner's declaratory judgment, accounting, and statutory wage claims. *See* Dkt. 107 at 21; Dkt. 110 at 14, 19–20. Accordingly, the Court considers the application of the statute of limitations for each in the same analysis. Moreover, Defendants raise a merits challenge to Raner's claim for an accounting, arguing that "an 'accounting' is not recognized as an independent cause of action unless the accounts are 'so complicated that an ordinary legal action demanding a fixed sum is impracticable.'" Dkt. 107 at 22 (quoting *Fradis v. Savebig.com*, No. CV 11-07275 GAF (JCx), 2011 U.S. Dist. LEXIS 154915, at *23–24 (C.D. Cal. Dec. 2, 2011)). Defendants only cite to California law in support of their argument. Under Washington law, a party has a cause of action for an accounting if they show: "(1) a fiduciary relation existed between the parties, *or* that the account is so complicated that it cannot be conveniently taken in an action at law; and (2) the plaintiff has demanded an accounting from the defendant and the defendant has refused to render it." *Cascade Falls, LLC v. Henning*, No. 25134-9-III, 2008 Wash. App. LEXIS 796, at *27–28 (Wash. Ct. App. 2008) (emphasis added) (citing *State v. Taylor*, 58 Wn.2d 252, 262, 362 P.2d 247 (Wash. 1961)). The Court denies Defendants' summary judgment motion on the merits of the accounting claim because they address it only in passing and do not address Washington law.

Richard and Joel respectively informed Raner that company expenses were deducted from his royalty payments. Defendants argue that, because Raner's theory is that the 2013 agreement provided his royalty would be calculated without deducting expenses, the breach occurred when The Fun Pimps started deducting expenses from his payments. According to Defendants, Raner has a single cause of action for breach of the entire contract, and any further alleged underpayments are part of the original breach that occurred in 2013.

Raner responds primarily by arguing that the January 2013 contract was one for "continuing services," and that "Washington courts hold that the statute of limitations for a contract involving 'non-divisible' and ongoing services begins to run upon termination of the agreement." Dkt. 110 at 15. Raner argues that Washington courts have found that a contract was one for continuing services where, as here, the contract is "entire" – rather than providing for "discrete items of services" – and does not provide for specific times for periodic payments. For the following reasons, the Court agrees that the contract at issue was one for continuing services and that the statute of limitations did not begin to run until Raner was fired by The Fun Pimps.

In *Ah How v. Furth*, 13 Wash. 550, 43 P. 639 (1896), a "domestic" worker sought to recover unpaid wages from the estate of his former employer under a contract that provided for a monthly salary. *Id.* at 551. The plaintiff alleged that his employer had paid him most, but not all, of the wages he was due under the contract and the court noted it "appear[ed] that numerous partial payments were made by [the plaintiff's employer] in his lifetime." *Id.* at 551–52. Even though the contract provided for a monthly wage, the Court emphasized that the contract did not fix a time for payment to the plaintiff. Accordingly, the Court held, "[w]here services are rendered under an agreement which does not fix any certain time for payment, nor when the services shall end, the contract of employment will be treated as continuous, and the statute of limitations will not begin to run until the services are ended." *Id.* at 552.

Subsequent decisions of the Washington Supreme Court reaffirmed and further clarified the continuing services rule. In *Morrissey v. Faucett*, 28 Wash. 52, 68 P. 352 (1902), the court noted that in *Ah How*, "[t]he services continued for a number of years, and some payments were made meanwhile," and held that "[t]he contract alleged in this case was for an indefinite time, and no time of payment was specified. The services were therefore continuous, within the above rule, and the statute did not begin to run until the services ended." *Id.* at 58. The Washington Supreme Court considered the continuing services rule again in *Perry v. Hillman*, 153 Wash. 689, 280 P. 346 (1929), declining to apply the rule and distinguishing *Ah How* as follows:

> We held in *Ah How v. Furth* . . . that, 'Where services are rendered under *an agreement which does not fix any certain time for payment*, nor when the services shall end, the contract of employment will be treated as continuous, and the statute of limitations will not begin to run until the services are ended.' However, in the case at bar the appellant by his complaint definitely fixed the time for the payment of his claims as of the date when the respondent was 'placed in funds or in a position reasonably to obtain funds available for the payment of such compensation.' Therefore the statute began to run as soon as the respondent was in the position described.

*Id.* at 699 (citations omitted) (emphasis in original); *see also id.* at 691–92 (noting that the plaintiff alleged in his complaint that, under the contract at issue, payment to the plaintiff was due when a sale was completed and the defendant – the plaintiff's employer – had the funds to pay the plaintiff the percentage of the sale that the plaintiff was due under the contract); *Merrick v. Greear*, No. 22139-3-III, 2004 Wash. App. LEXIS 1999, at *14 (Wash. Ct. App. Aug. 31, 2004) (noting that, in *Perry*, "[t]he court held that the contract called for separate and distinct payments *each due on a fixed date*. In such a case, a separate cause of action accrued with each missed payment," whereas "[t]he trial court determined that the oral agreement here was for ongoing, continuous services." (emphasis added) (citing 153 Wash. at 690–91)), *rev. denied*, 154 Wn.2d 1008, 114 P.3d 1198 (Wash. 2005). In setting out its holding, *Perry* cited the following

fundamental contract principles that elucidate the difference between contracts for continuing

services and divisible contracts:

> Where a contract provides that performance by the promisor shall take place on the happening of a certain event or the fulfillment of a certain condition, the cause of action accrues and the statute begins to run when the event occurs or the condition is complied with without performance of the promise being made.

*Id.* at 699–700 (quoting 37 C. J. 818). Accordingly, when a contract governing a working

relationship does not provide a fixed end date for services, or provide that the worker will

receive periodic payments at specific times before the services end, it is a contract for continuing

services and the statute of limitations for a breach of contract action begins to run from the date

the services ended. Washington courts have repeatedly reaffirmed this understanding of these

two rules. *See, e.g.*, *Graves v. Cascade Nat. Gas Corp.*, 51 Wn.2d 233, 238, 316 P.2d 1096

(Wash. 1957) (upholding lower court decision that the statute of limitations "began to run from

the date that each month's bill was payable" where the parties to the contract "*agreed* that

payment was to be made at the end of each month on rendition of a statement to the defendant."

(emphasis added)); *Richards v. Pac. Nat. Bank of Wash.*, 10 Wn. App. 542, 549, 519 P.2d 272

(1974) ("[T]here was clear, cogent and convincing evidence to support an implied contract for

'continuing and overlapping services.' The statute of limitations on amounts due under a contract

for continuous service does not begin to run until the contract is terminated." (citing *Ah How*, 13

Wash. at 552)); *Long v. Aubrey*, No. 37478–8–I, 1997 WL 435709, at *1 (Wash. Ct. App. Aug.

4, 1997) ("A cause of action begins to accrue when a party has a right to apply to a court for

relief. We reject Aubrey's argument that the statute of limitations began to accrue monthly. *None*

*of the agreements between the parties entitled Long to monthly payment for his services.* The

statute of limitations for amounts due under a continuous service contract does not begin to

1    accrue until the contract is terminated." (emphasis added) (citing *Macchia v. Salvino*, 64 Wn.2d

2    951, 955, 395 P.2d 177 (Wash. 1964)).

3        Applying these rules to the facts of this case, the Court concludes that Raner has provided

4    sufficient evidence to establish that his royalty agreement was a contract for continuing services

5    and that he is entitled to sue for all alleged underpayments. First, while Defendants argue that the

6    2013 written agreement was "augmented" by an oral contract executed in 2015, Dkt. 108 ¶¶ 10–

7    12, Raner states in his interrogatory responses attached to his response to the motion that the

8    original contract was "never amended." Dkt. 111-6 at 4. Resolving evidentiary disputes in

9    Raner's favor, *Lujan*, 497 U.S. at 888, the 2013 agreement is the only contract governing Raner's

10    working relationship with The Fun Pimps.

11        There can be no genuine dispute that the 2013 agreement was a contract for continuing

12    services. First, while the emails contain some discussion of the amount of time to be spent on

13    certain aspects of the project, *see* Dkt. 111-2 at 2 ("Its [sic] 6 months +.... like we ship in 6

14    months but might update the game for 3-6 months afterwards if sales are good and there is [sic]

15    good ideas to add."), the contract does not contain an agreement on an end date for Raner's

16    services, *see generally id. See Ah How*, 13 Wash. at 552 (providing that one feature of a

17    continuing services contract is that it "does not fix any certain time for . . . when the services

18    shall end"). Moreover, the email exchange does not contain any agreement entitling Raner to

19    periodic, advance payments under the contract; Raner only agreed to help develop the game and

20    work a certain number of hours per week in exchange for a percentage of the game's sales. *See*

21    *generally* Dkts. 111-2, 111-3, 111-4, 111-5. Accordingly, based on the evidence of the 2013

22    agreement, a reasonable trier of fact could only conclude that the 2013 contract was one for

23    continuing services. *Allen v. Lowe's Home Ctrs., LLC*, No. 21-55836, 2022 U.S. App. LEXIS

24    13756, at *3–4 (explaining that issues involving questions of fact "may be resolved as a matter

of law where . . . there is 'no genuine dispute as to any material fact,' and a reasonable jury could reach only one conclusion." (citations omitted) (citing Fed. R. Civ. P. 56(a)). Moreover, a genuine dispute of material fact exists as to whether the January 2013 agreement was ever amended based on Raner's statement in his interrogatory answer that it was never amended. *See* Dkt. 111-6 at 4. Accordingly, whether the January 2013 agreement was ever terminated and amended (before Raner's services ended in 2022) by a separate contract is a question of fact for the jury.[4]

Defendants themselves argue that Raner's royalty agreement was not divisible. *See* Dkt. 112 at 8 n.2. The Court agrees. Washington courts and other persuasive authorities make clear that the mere fact that, in practice, a worker receives periodic, advance payments on a contract does not necessarily mean the contract is divisible; rather, the focus is on whether the contract itself expressly entitles the worker to receive said payments. *See Ah How*, 13 Wash. at 552–53 (finding the statute of limitations began to run from the date of the contract's termination even though the parties had agreed to a monthly wage and "numerous partial payments were made" on the contract before the plaintiff's services ended); *Macchia*, 64 Wn.2d at 955 (applying continuing services rule to a contract that provided for a "salary of $500 a month"); *cf.* 31 Williston on Contracts § 79:21 (4th ed. 2023) ("Where, however, a contract that is not strictly divisible provides for an entire continuing performance and that performance is continued, *in spite of a breach in failing to make partial payments or to render such other part performances*

---

[4] Although the continuing services rule is still good law in Washington, and although courts have applied the rule recently, *see, e.g., Attachmate Corp. v. Health Net, Inc.*, NO. C09-1161MJP, 2010 U.S. Dist. LEXIS 114445, at *16 (W.D. Wash. Oct. 26, 2010), the Court acknowledges that the rule was largely developed in older decisions. Most contemporary contracts for long-term work will include terms entitling the worker to periodic payments and specifying when they will be made. The scenario here – where Raner earned large sums of money over many years based on an informal written agreement reached over instant message – is unusual.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' FIRST MOTION FOR SUMMARY JUDGMENT - 12

*as would have justified discontinuance*, there seems good reason to allow recovery of damages based on the entire payment or performance promised, at any time within the statutory period computed from the time when the completed performance was due." (emphasis added)).

Defendants instead argue that there was only one breach for the entire contract and that breach occurred – and the statute of limitations began to run – when The Fun Pimps first paid Raner based on "net profits after expenses" in contravention of the alleged agreement to pay Raner based on gross sales and without any deductions. Defendants primarily rely on the general rule that "a cause of action accrues when a party has the right to apply to a court for relief." Dkt. 107 at 20 (citing *1000 Va. Ltd. P'ship*, 158 Wn.2d at 575). However, the continuing services doctrine is not irreconcilable with this rule, nor is it an exception to it; as explained, if a contract does not establish fixed times for payment in exchange for specific performances, a breach does not occur based on advance payments that are not guaranteed by the contract.

Moreover, based on the above analysis, the two additional cases that Defendants rely on – *Schreiner Farms, Inc. v. Am. Tower, Inc.*, 173 Wn. App. 154, 293 P.3d 407 (2013) and *Ford v. Int'l. Harvester Co.*, 399 F.2d 749 (9th Cir. 1968) – are distinguishable. In each case, the court found that subsequent actions by the plaintiffs did not extend the time to bring a lawsuit on an initial breach.[5] However, here, as stated, no breach occurred under the contract until Raner's services ended without payment of the full amount owed.

Because Raner's lawsuit was filed the same day that The Fun Pimps fired him, Dkt. 111 ¶ 18, if the contract is one for continuing services, the statute of limitations would not bar Raner's suit for any payments made under the contract. Accordingly, because the Court finds that the

---

[5] In *Ford*, the Ninth Circuit appeared to recognize the divisibility rule, but held that it did not apply to that case. *See* 399 F.2d at 752 ("[P]laintiffs' action accrued when the contract was breached no later than April 1961, and the subsequent damages are not *severable* from the original cause of action." (emphasis added)).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' FIRST MOTION FOR SUMMARY JUDGMENT - 13

2013 agreement was a contract for continuing services, and a jury could conclude the 2013 agreement governed the parties' entire relationship, Defendants' motion as to Raner's breach of contract, declaratory judgment, accounting, and unpaid wage claims as barred under the statute of limitations is DENIED.

### 2.   Partnership Claim

#### a.   Statute of Limitations

"A 'partnership' is 'an association of two or more persons to carry on as co-owners a business for profit.' A partnership agreement must contemplate a common venture, a sharing of profits and losses, and a joint right of control." *Samra v. Singh*, 15 Wn. App. 2d 823, 833, 479 P.3d 713 (2020) (first quoting RCW 25.05.005(6); then citing *Eder v. Reddick*, 46 Wn.2d 41, 49, 278 P.2d 361 (Wash. 1955)).

Defendants argue that "assuming, for the sake of this motion, a partnership was formed in January 2013 between Raner and the Hueninks (that does not violate the statute of frauds) in which the Hueninks were to pay Raner 5% gross royalty in perpetuity, Raner similarly knew as of May 2013 that TFP (or the Hueninks) were not going to pay him 5% gross perpetual royalty as a partner, and his claim for breach of a corresponding fiduciary duty accrued at that time." Dkt. 107 at 23.

Raner's second amended complaint alleges that the Hueninks breached their fiduciary duties owed to Raner under the partnership agreement. *See* Dkt. 53 ¶¶ 67–68, 70–73. In clarifying the legal theory underlying the claim, Raner states: "Raner's claim is that he and the Hueninks' partnership was for the development of 7 Days to Die, from which Raner would receive 5% of the profits, not the formation of, or any ownership interest in, any entity." Dkt. 110 at 17.

"Whether an action is in contract or tort depends on the pleadings and evidence relied on. . . . If the tortious breach of a duty, rather than a breach of a contract, gives rise to the cause of action, the claim is not properly characterized as breach of contract." *Owens v. Harrison*, 120 Wn. App. 909, 915, 86 P.3d 1266 (2004). "[T]he cause of action for breach of the partnership agreement is grounded, not on breach of a specific term of the contract, but on a tortious breach of fiduciary duty arising from the contract." *Hudson v. Condon*, 101 Wn. App. 866, 873, 6 P.3d 615 (2000), *rev. denied*, 143 Wn.2d 1006, 21 P.3d 290. Thus, because breach of fiduciary duty is a tort claim, the applicable statute of limitations is three years. *Id.* at 874 ("The Hudsons base their claim for partial rescission on breach of fiduciary duty and fraud under the partnership contract, and because those actions sound in tort and fraud, the applicable statute of limitations is three years." (citing RCW 4.16.080)).

Raner argues, and Defendants do not dispute, that the "discovery rule" applies to Raner's partnership claim. Accordingly, the Court will apply the rule here. *See Killian v. Seattle Pub. Schs.*, 189 Wn.2d 447, 454, 403 P.3d 58 (Wash. 2017) ("Generally, we apply the discovery rule to determine when a statute of limitations begins to run."); *Allen v. State*, 118 Wn.2d 753, 758 n.4, 826 P.2d 200 (Wash. 1992) (applying discovery rule because each party assumed that it applied and neither party argued that it did not apply).

> The discovery rule postpones the running of a statute of limitations until the date that the plaintiff "through exercise of due diligence, should have discovered the basis for the cause of action, even if actual discovery did not occur until later." Whether the plaintiff knew or should have known that a cause of action has accrued through the exercise of due diligence is a question of fact. However, 'factual questions may be decided as a matter of summary judgment if reasonable minds can reach but one conclusion.

*Mason v. Mason*, 19 Wn. App. 2d 803, 826, 497 P.3d 431 (2021) (citations omitted). "The key consideration under the discovery rule is the factual, not the legal, basis for the cause of action." *Killian*, 189 Wn.2d at 455.

Both parties agree that the partnership claim accrued upon exclusion of Raner from the partnership. *See* Dkt. 107 at 23–24 (citing *Reising v. Paulsen*, No. 46124-9-I, 2001 Wash. App. LEXIS 145, at *4 (Wash. Ct. App. Jan. 29, 2001)); Dkt. 110 at 18 (citing *Dvorak v. Knapp*, No. 45954-6-I, 2001 Wash. App. LEXIS 2049, *11-12 (Wash. Ct. App. Sept. 4, 2001)). Defendants argue, based on Raner's clarification for the basis of his partnership claim in his response, that "[e]ven assuming for this motion that a partnership was formed in the initial January 2013 email exchange, there is no dispute that it was dissolved and superseded when TFP was formed on April 19, 2013 to develop, market and sell the 7 Days to Die game, and included only Richard, Joel and Christian Lang as members" and that "Raner knew that as of May 31, 2013, and never participated in any way in the ownership, management or control of TFP, and had no right to control any decisions of TFP." Dkt. 112 at 9.

"[E]xclusion must be sufficiently unambiguous to put a reasonable person on notice that he or she is in fact being excluded for the statute of limitation to begin to run." *Dvorak*, 2001 Wash. App. LEXIS 2049 at *11; *see also Malnar v. Carlson*, 128 Wn.2d 521, 532, 910 P.2d 455 (Wash. 1996) (rejecting contention that an argument between the parties to a partnership "over their relationship" was evidence of dissolution where "neither party alleges that any statement was made that either party considered their partnership to be terminated.").

One is a member of a partnership only if they have a "joint right of control of its affairs." *See Bengston v. Shain*, 42 Wn.2d 404, 409, 255 P.2d 892 (Wash. 1953). In *State v. Bartley*, 18 Wn.2d 477, 482, 139 P.2d 638 (Wash. 1943), the Washington Supreme Court upheld the lower court's determination that no partnership existed with respect to a business because, among other reasons, those claiming the partnership existed "had no right of management or control in the business end of the enterprise" and "[t]he division of profits was but additional compensation for their services, and was a device to induce them to remain in his employ." 18 Wn.2d at 483. To

1    the extent a partnership ever existed between Raner and the Hueninks for the development of the

2    "7 Days to Die" game, Raner should have known that he was no longer a part of said partnership

3    by the beginning of his time working on the game. Raner never argues why he should not have

4    known by the beginning of his time working on "7 Days to Die" that he had no "joint right of

5    control" over its development. Moreover, no reasonable person in an employer-employee-type

6    relationship, who receives assignments and instructions from their supervisors who prioritize the

7    worker's tasks, would think they have a "joint right of control" with said supervisors over the

8    "affairs" of the venture. Dkt. 111 ¶ 25 ("While I was working on the game, TFP identified the

9    tasks that I was to perform, often providing the specifics of how the task was to be completed.

10   For example, the Hueninks would often provide me with a sample piece of game art that they

11   wanted me to duplicate or modify. They also gave me specific instructions as to sizing, color,

12   style, or method of creating the art. While I had some freedom to work on my own ideas for the

13   game, the Hueninks prioritized the tasks that I worked on. Early on, prioritization was done via

14   emails or chat messages in which I was told the items on Richard's list that were the highest

15   priority.").

16          No reasonable factfinder could conclude that, if Raner was in a partnership with the

17   Hueninks for the development of "7 Days to Die," that Raner was not aware that he was

18   excluded from it at least by 2013. Accordingly, the Court will GRANT summary judgment as to

19   Raner's partnership claim because the statute of limitations ran long before Raner filed this suit.

20                           b.  *Equitable Tolling*

21          Raner argues that, if any of his claims are barred by the applicable statute of limitations,

22   the Court should find that they are not barred under the doctrine of equitable tolling. *See* Dkt.

23   110 at 22.

24

Equitable tolling in civil suits is an "extraordinary form of relief" that is to be used "sparingly." *Fowler v. Guerin*, 200 Wn.2d 110, 118–19, 515 P.3d 502 (Wash. 2022). To justify its application, the proponent must demonstrate that "(1) the plaintiff has exercised diligence, (2) the defendant's bad faith, false assurances, or deception interfered with the plaintiff's timely filing, (3) tolling is consistent with (a) the purpose of the underlying statute and (b) the purpose of the statute of limitations, and (4) justice requires tolling the statute of limitations." *Id.* at 125. "Washington courts must evaluate each part of this standard in light of the particular facts of each case and should equitably toll the applicable statute of limitations only when all four parts of the . . . standard are satisfied." *Id.* "The party asserting that equitable tolling should apply bears the burden of proof." *Price v. Gonzalez*, 4 Wn. App. 2d 67, 75, 419 P.3d 858 (2018). "Where, as here, none of the controlling facts are in dispute, a district court may decide the question of equitable tolling as a matter of law." *Moussouris v. Microsoft Corp.*, No. C15-1483JLR, 2016 WL 6037978, at *6 (W.D. Wash. Oct. 14, 2016) (citing *Aronsen v. Crown Zellerbach*, 662 F.2d 584, 595 (9th Cir. 1981)).

Raner does not offer sufficient evidence of bad faith, false assurances, or deception that shows why equitable tolling should apply to his partnership claim. First, Raner argues that "bad faith" under the second element of the equitable tolling test can be proven by showing "evasion of the spirit of the bargain," Dkt. 110 at 23, and points to evidence that he claims shows Defendants acted in this manner. *Id.* at 22–23 (citing Dkt. 111 ¶¶ 9–18). The only case Raner cites for this proposition is an unpublished Washington Court of Appeals decision defining "bad faith" in the context of attorney's fees by looking to the term's definition in Black's Law Dictionary. *Alpine Quality Constr. Servs., Inc. v. Johnson*, No. 35536-1-II, 2008 Wash. App. LEXIS 1485, at *11–13. However, equitable tolling was not at issue in that case, and the Court declines to adopt such a broad definition of "bad faith" that is not justified by Washington

1   Supreme Court decisions, especially in light of the court's admonition that equitable tolling is to

2   be used "sparingly." *Fowler*, 200 Wn.2d at 119; *see Arizona Elec. Power Coop. v. Berkeley*, 59

3   F.3d 988, 991 (1995) (holding that, when interpreting state law, federal courts are bound by

4   decisions of the state's highest court and that decisions of the state's intermediate appellate

5   courts may be used to "predict how the highest state court would decide" an issue that the

6   supreme court has not addressed).

7        Raner next argues that the Washington Supreme Court's decision in *Millay v. Cam*, 135

8   Wn.2d 193, 206, 955 P.2d 791 (1998) is "instructive," and highlights the court's holding that

9   "tolling is appropriate where the party redemptioner in possession of the real property submits a

10  'grossly exaggerated statement' of the sum required to redeem and the prospective redemptioner

11  cannot with due diligence ascertain the sum required to redeem within the statutory redemption

12  period." Dkt. 110 at 23 (quoting *Millay*, 135 Wn.2d at 206). However, Raner does not apply this

13  rule to the facts of this case and points to no evidence showing that Defendants made a "grossly

14  exaggerated statement" (or something similar) that delayed Raner's filing of this lawsuit. *See id.*

15       Finally, Raner cites to *Bally v. Ocean Transp. Servs., LLC*, No. 56154-5-I, 2007 Wash.

16  App. LEXIS 135 (Wash. Ct. App. Jan. 29, 2007), where the Washington Court of Appeals held

17  that "[f]raudulent misrepresentation is an appropriate theory on which equitable tolling may be

18  invoked" and that fraudulent misrepresentation may be established by showing "that the

19  defendant breached an affirmative duty to disclose a material fact." *Id.* at *17; *see also Giraud v.

20  Quincy Farm & Chemical*, 102 Wn. App. 443, 453, 6 P.3d 104 (2000) ("If there is a special

21  relationship between the parties, such that the law imposes an affirmative duty to disclose

22  material information, silence may be sufficient to establish fraudulent concealment.").

23  "Washington courts require more than a mere failure to provide information for a claim of

24  fraudulent concealment." *Nordhorn v. Ladish Co.,* 9 F.3d 1402, 1406 (9th Cir. 1993) (citing

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' FIRST MOTION FOR SUMMARY
JUDGMENT - 19

*Wood v. Gibbons,* 38 Wash. App. 343, 685 P.2d 619 (1984), *rev. denied,* 103 Wn.2d 1009

(1984)). "[A] case of fraudulent concealment is made out when a plaintiff avers facts which

show (1) that the plaintiff exercised due diligence in trying to uncover the facts, and (2) that the

defendant engaged in affirmative conduct which would lead a reasonable person to believe that

no claim for relief existed." *Id.* (citing *Central Heat, Inc. v. Daily Olympian, Inc.,* 74 Wn.2d 126,

135, 443 P.2d 544 (Wash. 1968)).

Raner argues that the following constituted The Fun Pimps' failure to disclose material

facts that led him to believe that he did not have a claim for relief: "(2) TFP, through the

Hueninks, provided assurances to Raner that they would not deduct expenses from gross

revenues apart from limited expenses that Raner agreed to in May 2013; (3) TFP never provided

an accounting to Raner; (4) upon Raner's inquiry, TFP still failed to provide an accounting."

Dkt. 110 at 23.  However, any alleged misrepresentation regarding how Raner was being paid is

unrelated to the fact that Raner should have known that he did not have joint control over the

development of "7 Days to Die," at which point his partnership claim accrued as explained

above. Raner does not point to any evidence of "affirmative conduct" by Defendants that led him

to believe that he *did* have such joint right of control and thus was not excluded from the alleged

partnership. Moreover, "[f]raudulent concealment cannot exist if a plaintiff has knowledge of the

relevant facts." *Vollstedt v. Tegman*, No. 63392-9-I, 2010 Wash. App. LEXIS 730, at *6 (Wash.

Ct. App. Apr. 12, 2010) (citing *Giraud v. Quincy Farm and Chemical*, 102 Wn. App. 443, 455, 6

P.3d 104 (2000)). As the Court previously explained, based on Raner's own account of the

Hueninks acting as his supervisors throughout his time working on the game, Raner was aware at

the beginning of his working relationship with Defendants that he did not have a joint right of

control over the development of "7 Days to Die." Having failed to provide evidence to support

an element of fraudulent concealment, Raner has not met his burden to justify application of equitable tolling.

### 3.    *Perpetual Royalties Claim*

Defendants argue that "[t]o the extent that Raner contends that there was a verbal contract in January 2013 wherein he was promised 5% royalties in perpetuity, such verbal agreement violated the statute of frauds and is unenforceable as a matter of law." Dkt. 107 at 30. Raner counters that his claim for perpetual royalties is not based on a verbal agreement, but on the January 2013 email exchange and that "[t]o the extent the statute of frauds applies, this email exchange satisfies its requirements." Dkt. 110 at 26.

Under Washington's statute of frauds, "[e]very agreement that by its terms is not to be performed in one year from the making thereof" "shall be void, unless such agreement, contract, or promise, or some note or memorandum thereof, be in writing, and signed by the party to be charged therewith, or by some person thereunto by him or her lawfully authorized." RCW 19.36.010.

Defendants' motion argues in the alternative that the Court should interpret the contract as not including a perpetual royalty. *See* Dkt. 30–31 ("Raner's argument likewise fails even if he contends that 5% royalties in perpetuity was promised him in writing. There is no dispute that the January 19, 2013 email exchange outlining the parameters of the independent contractor agreement never stated or implied that royalties would be in perpetuity. . . . The only possible implication is that the 5% royalties would continue only so long as Raner was providing independent contractor services, and would not continue in perpetuity otherwise."). Raner argues in response that the 2013 agreement can be reasonably interpreted to include a perpetual royalty, and therefore, there is a genuine dispute of material fact as to whether the 2013 agreement provided for a perpetual royalty. Dkt. 110 at 27 ("A jury may reasonably conclude that the

parties intended through this email exchange for TFP to pay Raner a 5% royalty in exchange for which Raner was only required to put in work for the game to ship and to update it for some period of time after.").

"Summary judgment on an issue of contract interpretation is proper when the parties' written contract, viewed in light of the parties' other objective manifestations, has only one reasonable meaning." *Kries v. WA-SPOK Primary Care, LLC*, 190 Wn. App. 98, 119, 362 P.3d 974 (2015); *see Scott Galvanizing v. Northwest Enviroservices*, 120 Wn.2d 573, 582, 844 P.2d 428 (Wash. 1993) ("[I]nterpretation of a contract provision is a question of law only when (1) the interpretation does not depend on the use of extrinsic evidence or (2) only one reasonable inference can be drawn from the extrinsic evidence."). Accordingly, "if two or more meanings are reasonable, a question of fact is presented." *Kries*, 190 Wn. App. at 120.

Generally, words in a contract are given "their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 504, 115 P.3d 262 (Wash. 2005). Washington courts have used dictionary definitions in making this inquiry. *See Pallotta v. Julep Beauty, Inc.*, No. 80011-6-I, 2020 WL 3052814, at *4 (Wash. Ct. App. June 8, 2020).

Here, the parties agree that the pertinent written terms of the royalty agreement are contained in their January 2013 email exchange. *See* Dkt. 107 at 30–3; Dkt. 110 at 26–27. During the exchange, both parties consistently use the term "royalty" to describe Raner's method of payment under the contract. Joel describes the project and how long he thought the parties might work on it, at least at its initial stages. Dkt. 111-2. Joel then says: "I have 1 to 5% royalty to share with you for your effort, depending on how much free time you have." *Id.* Raner responded: "I could probably put in several hours a week. How many hours a week were you hoping to get for 5% royalty," Dkt. 111-3 at 2, to which Joel responded that they'd like him to

work "20 hours a week or more for that." Dkt. 111-4 at 3. Raner then accepts the offer, stating: "Yeah I'm on board. I think 20 hours a week is pretty doable." Dkt. 111-5 at 2.

Black's Law Dictionary's definition of "royalty" notes that "[r]oyalties are often paid *per item* made, used, or sold, *or per time elapsed.*" *Royalty*, Black's Law Dictionary, (11th ed. 2019) (emphasis added). Merriam Webster's Dictionary defines it as follows: "a payment to an author or composer for each copy of a work sold or to an inventor for each item sold under a patent." *Royalty*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/royalty. Accordingly, a reasonable juror could decide that the royalty contracted for in 2013 was indefinite as the word is often used to describe a payment that is tied to sales of a product with no end date for the payments. Summary judgment as to Raner's claim for perpetual royalties is DENIED.

### III.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 107) is GRANTED IN PART AND DENIED IN PART as follows:

- Summary judgment is DENIED as to Raner's claim for breach of contract, declaratory judgment, accounting, and unpaid wages;

- Summary judgment is GRANTED as to Raner's partnership claim;

- Summary judgment is DENIED as to Raner's claim for a perpetual royalty.

Dated this 10th day of April, 2024.

Tiffany M. Cartwright
United States District Judge